at all. Ms. Junk, for the appellant, Mr. Stewart, for the appellant. Good morning, Ms. Junk. You may proceed. Good morning, and thank you, Your Honors. May it please the Court. You know, I did try to get Mr. Shelley to cover this one for me as well,  Thank you. This case centers on the difference between the ability to administratively revoke a document versus revocation of citizenship status itself. And as the Supreme Court held in Trot v. Dulles, neither the Congress nor the Executive, nor the Judiciary, nor all three in concert, may strip away birthright citizenship without the due process as guaranteed under the Constitution. That was true when the Supreme Court held so in 1958 and it remains just as true today. There's no dispute here that Hoda Muthana was born after her father stopped working as a diplomat. But before the notice was received, right? That is actually in dispute, Your Honor. Is the record before us that she was born between the NDP duties and the time of the notice? Your Honor, there was some documentation presented at the District Court by the government showing that the blue list was dated February after her birth, a couple of months after her birth, recognizing the notification. So what we have before us, there's been a finding that her birth was between those critical dates, right? There's been a finding that her birth was after his duties ended. Before the notice was sent, right? We don't know that it was before the notice was sent, Your Honor. Isn't there a finding to that effect by the District Court? The District Court did defer to the government's holding on that, or the government's representation on that. I mean, that would be yes to my question, right? As to the District Court's decision, yes. We did ask for a discovery on that issue because we don't believe that it was established in its indispute, but that was the holding of the District Court. We would say, however, though, that if you look at the language of Article 43 of the Vietnam Convention, it is not as clear that notification is the only measure of when the end of diplomatic status is triggered. The Article 43 contains the term inter alia, as far as when the function of diplomatic agent comes to an end, right before listing notification being received by the host state. And as we've set forth in our briefs, the documentation behind the intent at that time was to intentionally leave it open and leave it vague. It is not restrictive. It is expansive, among other things. The government has argued in other cases and in other situations that diplomatic immunity ends when the duties end, and there is no dispute that the duties ended prior to Ms. Mazama's birth year. I want to ask you, assuming we all think that this turns on notification and nothing else, in your brief, one of the documents in support of the Donovan Declaration was this U.N. termination list, and you raised some concerns about that. It contains a bunch of incomprehensible handwritten notes. We couldn't read them. But the date is February 5th. I don't see there's any inconsistency between that and the Donovan Declaration. What I would say to that is that, first of all, there is a date entered as of February 2005, but we are not clear if that's the first time that notations were entered, if that's the first time that there is an entry. We know that February 2005 is the date of the publication. But the Declaration itself says February 5th. There are other documents, which I'll get to in a minute, but I don't understand why this document is inconsistent with what Donovan says in here. Your Honor, I believe that the inconsistency that we point to here is with the October 18th, 2004, letter from the Minister Counsel for Host Country Affairs, at the first time that the Department of State was looking at Donovan's application for transfer. Ms. Chunk, that's why I asked you the question. So what the case really turns on is whether there's an inconsistency between the earlier letter, the one by Graham, and the Donovan one, right? That's the question. That is part of the question, Your Honor, but both of those go to revoking the document of the passport and the government's right to revoke the document of the passport, not to whether the Department of State had the right to revoke her citizenship. If the Department of State had said it, it revoked her citizenship. All it did was say, as I understand it, the Department's view is that she never had citizenship, and therefore it revoked the passport. Your Honor, she had been issued... I mean, her citizenship, I just... ...revoking the passport because she was not a citizen. Is that wrong? Your Honor, as to revoking the passport, the document itself, that in itself would be within the Department of State's discretion to do administratively. The district court's holding specifically states that Ms. Madonna was not born a U.S. citizen, and she had been previously issued two U.S. passports. She had been previously recognized by the Department of State as a United States citizen, and the district court's holding specifically says that, well, no, she's not anymore now. That doesn't really answer the question. The insurance of the passport is a function by some functionary who has no authority to stop the government from denying citizenship later. A functionary employee of the United States government cannot stop the government from anything, can he? Your Honor, under 22 U.S.C. 2705, a passport has the same force and effect as proof of citizenship, as do certificates of naturalization or citizenship that is issued by the attorney general. That's not the same question. An incorrectly issued certificate or an incorrectly issued passport can't confer citizenship. It may be evidence or proof, if you use the word, of citizenship, but that doesn't confer the citizenship. If it's found to be erroneously issued, the government cannot stop, is it, from denying the person was a citizen ever in the first place? Your Honor, I would say that the government is not stopped from revoking, again, the document. But once the citizenship has been recognized, the government does not have to stop. Has been recognized by some functionary at the field level, but there's no case that says that government can be stopped from anything by that level employee. I think the rule is the United States government is not stopped by the accident's employees. Is that not, am I wrong about that? Your Honor, it wasn't just the fact that this one individual, who is the Minister of Counsel for Host Country Affairs, issued a letter. It's the fact that the Department of State itself, as a department, which is charged with this responsibility, issued two passports, and this is out of recognizing her as a United States citizen. Yes, but incorrectly, according to the government's position, recognizing. And what it's doing is revoking the document because it was incorrectly issued. That is the current argument that they're making, Your Honor. And I would say that the court is not required to defer to that. I'm not calling for deferences, though. I'm just asking if the government can't do that. What would keep them from saying this was improperly issued? She's not a citizen, is she? I would say, Your Honor, under the authority of C.W. Tellerson and the authority that's cited within that holding, that the government needs to be put to its proof to show that she's not a citizen if it's not changing its mind as to what had happened previously when she was issued two U.S. passports recognizing her as a United States citizen. And the government has not yet been put to its proof. This was a grant of a motion to dismiss, which was converted to a summary judgment with no discovery that was allowed to occur and no new information that came to light to the government that it did not have in late 2004 and early 2005 when it first issued her U.S. passport and renewed it in 2014. Can I perhaps follow up on Josephine Hill's question in a different way? Because if we assume we agree with the government that Ms. Musano was not a citizen at the time of her birth, I know you're arguing against that, but assume that for a moment. So is your position that even if she were not a citizen at birth, that she would somehow now have a citizenship status through the recognition of citizenship by the executive branch in her passport? And I guess if that's your view, I mean, do you have any support for that proposition? Are there any cases suggesting that the executive branch can confer citizenship on a person who doesn't have it under the Constitution or statute of the United States? Your Honor, in response to that, I would say that if we compare the cases of the Hazam case and the Magnuson case, in the Hazam case there was no dispute that the individual never should have been granted citizenship, never had a legal right to citizenship to begin with, and that the law was incorrectly applied at the time that the first passport was granted. There was no dispute in that case that those were the facts. The individual argued that he should be able to keep his citizenship anyway because once the government granted it, then in that case they were, once the government had granted that, the government was not allowed to change its mind. That is not what we're arguing here. What we're arguing here is more in line with the Magnuson case, and if you look at that, it is that there simply cannot be just a second look because they decided to take a second look and change their mind, and the government has not been put to its proof on that. At this stage, at this minute, we're extremely sure. I think you're fighting ahead of time. I mean, if we assume she was not a citizen at birth, could she have acquired citizenship by the executive branch giving her a passport? Your Honor, she could have acquired citizenship, if she was not a citizenship as of the date of her birth. She would have been able to acquire citizenship in multiple other ways, but she did not because she relied on the representation and the grant and the official document from the Department of State that she was a United States citizen. As with Mr. Mezana's older children, he would have gone through the process of getting them lawful permanent resident status, and then they became citizens later. And when Mr. Mezana himself was later naturalized, while Ms. Mezana was still a minor, she would have been eligible for citizenship at that point as well. She didn't pursue any of those avenues because during all of those times, she was recognized as a United States citizen. So we just think her reliance interest creates a right by the executive branch to confer citizenship on her or by the district court or by courts to confer citizenship on Ms. Mezana? We're not asking the district court to confer citizenship on her or the Department of State to confer citizenship on her. What we're asking is that the status quo where she has citizenship that has been recognized be maintained until the government is put to its proof to establish otherwise, other than through a motion to dismiss with review of other documents, which is what has happened here. There has not been the appropriate due process to show that it was erroneously issued and should be revoked. That has not happened, or rescinded. But that has not happened, that due process has not been afforded to Ms. Mezana thus far under the facts of this case and at the status of where we are, at which point the district court granted judgment and ruled her not to be a citizen as of the time of birth. That discretion is not within the district court and it's not within the Department of State to remove the citizenship status. They can revoke the document. Section 1504, which the government has relied on, gives the government the authority to revoke a passport document if it determines, for whatever reason, that the document was erroneously issued. But it does not. Nothing in there grants the government any authority, or for that matter the courts, any authority to revoke the citizenship status. That is something that is just simply not up to those agencies to do and that is what's happened here is that her status has been revoked through the holding of the district court. If you look at 8 U.S.C. 1504A, the sentence at the end of that is that the cancellation under the section of any document purporting to show the citizenship status of the person to whom it was issued shall affect only the document and not the citizenship status of the person in whose name the document was issued. And that is the statute which specifically refers to the Secretary of State's right to revoke a document that it subsequently believes was erroneously obtained or illegally or fraudulently obtained. It still does not give the right to revoke the status of the citizenship, just the document. Okay, unless my colleagues have any further questions. Judge Brown, were you finished? Yes, I am, thank you. No questions. Okay, we'll hear from Mr. Stewart. Thank you, Your Honor. May it please the court, I'm Scott Stewart on behalf of the United States. In this case, the district court granted summary judgment to the government on the plaintiff's many claims that rested on the assertion that his daughter is a United States citizen. The court concluded, under the governing law and the conclusive evidence submitted by the government, Hoda Muthana is not a United States citizen. The district court also refused to provide the plaintiff with an advisory opinion regarding hypothetical actions that he may take to implicate federal criminal law. The district court was correct to rule for the government this court should affirm. I'll lead, of course, with the main and central issue in this appeal, Your Honor, regarding the plaintiff's diplomatic status and, therefore, the citizenship status of his daughter. As we've explained, this case is over-determined in a number of ways. The Vienna Convention sets forth the governing principles quite clearly. The Department of State has reasonably construed those principles  and provided a conclusive certification regarding the dispositive citizenship issue regarding the dispositive diplomatic immunity issue that decides the citizenship question, Your Honors. In short, the analysis goes like this. Under the plain language of the Vienna Convention, the functions of a diplomat end on official notification to the receiving state. When functions end, that's under Article 43, when those functions end, then immunity ceases when a person leaves the country or after a reasonable time to do so, and usually that can go a reasonable period of 30 days beyond unless the person's already been afforded a reasonable period. That's how the Department of State has interpreted it here, consistent with that interpretation. Mr. Donovan submitted a certification setting forth the conclusive dates on which the plaintiff possessed diplomatic status that went through early February 1995 after Ms. Muthana's birth. Under longstanding Supreme Court law, law applied by other circuits more recently, that is conclusive, that decides the question. And as we've also explained, Your Honor, and as I think some of Your Honor's questions pointed out, the underlying contemporaneous documents also bear that out. The Cardex card makes clear that Ms. Muthana was added to her father's diplomatic Cardex card. As Mr. Donovan explained, the only reason to do that would be if Mr. Muthana still retained diplomatic status at the time of her birth. That's why you add another member of the household to make clear that that person also had diplomatic status. And given that certification, which, again, is based on a reasonable interpretation of the end of convention here, Your Honors, that certification is conclusive. The other courts have done similarly. Most recently, cases like Al-Hamdi in the Fourth Circuit, Abdul Aziz in the Eleventh Circuit have noted the importance of certification. But I'd also just note there's a very, very long pedigree for this sort of treatment of a State Department certification, Your Honor. A leading case noting the importance of this is the Supreme Court's decision in Inrei Baez. This is a late 19th century decision. And the court there noted he was assessing the diplomatic status of someone and that person's amenability to suit. It looked at Secretary of State certifications going back, I believe, to Secretary of State Madison. So the pedigree is quite longstanding. And the Supreme Court emphasized there, Your Honor, that the Department of State had not provided a certification attesting to the putative diplomat status in that case. And it noted that that was quite important because, in the end of its opinion, it said, look, when a court gets that certification, it's entitled to accept that. It doesn't need to hear collateral proof. And these certifications just have a conclusive, decisive pedigree in the law when based on a reasonable interpretation, as the one here is, Your Honor. But as we've explained, they also are corroborated by the relevant documents. If I can just note a few points, and I think Your Honor's already highlighted a number of the responses here in the prior colloquy with my friend. The plaintiff here really did not create any plausible dispute. First of all, as noted, the certification is conclusive, but the plaintiff had a number of assertions that were just kind of hollow and said, look, we don't know about what we've said on the blue list. But as I believe Judge Santel or, my apologies, Judge Cato pointed out, that document itself has a February 1995 date on it, the Cardex document, the Thomas record, all underscore that the critical date here, the date of official notification, is undisputed. I'm sorry to interrupt, but I just want to call your attention. I agree with virtually everything you've said here. There's just one thing that came to trouble for me. Yes, Your Honor. And I want to ask you about it. That's this 2004 grant letter, which is on official stationery, has the stairs that seal the United States, and it has a different date. And my question is, my bottom line question, the question of, we all agree, well, I agree with you in terms of notification. Notification is a question of fact. Here we have two documents with two different notification dates. Now, you say in your brief that it speaks only of the date of employment, but it doesn't say that he was employed between those dates. It says he was notified to the U.S. mission during this period. And that's a technical term under the Vienna Convention. In fact, the phrase is virtually identical to paragraph 39, which says, if someone's already in the territory, from the moment his appointment is notified. So it just looks to me like we've got two competing letters here, both from the same office, both on the same letter. Different people. One has a December date, one has a February date. Isn't that just classic? How can you grant summary judgment based on that, particularly since ______? Sure, Your Honor. So we don't know what purpose this grant letter was prepared for. It does not squarely address Ms. Muthana. It doesn't address her birth. No, it doesn't address the question in this case. Respect. That's the question, isn't it? You agree with me, right? I think official ______. I'm sorry, Your Honor. It's the date of notification. That's the only question. If notification was in February, you would, because she was born while he was ______. So it all turns on notification. And what we have here is two competing pieces of evidence. It's very strange. How can you grant, particularly since we have to, at this stage, give the benefit of the doubt to the plaintiff, how can we grant a summary judgment? Because there are a couple reasons, Your Honor. Most centrally, I take your point about the mention of notification, but it does not address the question of notification of termination. It says that the person was notified for those stretch of dates. You don't have to put it at the Geneva Convention. The Geneva Convention just says, I just read it to you, it just says, or already in the territory, from the moment he was appointed, he was notified to the Ministry of Foreign Affairs. That's all. It doesn't have to say termination. It just says notified. That's exactly the language from the Geneva Convention. And it said that during this period of time, he was recognized by the Department of Disentitled Composers of Modern Music during that period of time. Correct. It would suggest that it wasn't after this. I'm not saying you're wrong. I just don't understand how you can grant a summary judgment on this record. Sure, Your Honor. I think I've got a couple. Understood on your concerns, Your Honor. Let me see if I can answer those directly. The thing that I would notice, there is a difference between notice of appointment and arrival on the one hand and notification of final departure or termination of the functions. Article 10.1a of the Vienna Convention emphasizes those as different things. You need notification of all pieces, or there's a requirement for notification of all pieces. So there is a question. The Donovan Certification does address official notification of termination. The Graham Letter does not address that piece, Your Honor. It speaks only to this other period. It doesn't squarely speak to what happened after that period. So for all we know, he was just… Let me interrupt you. The letter, the other letter, doesn't say anything more either. Mr. Donovan's certification, Your Honor. These are identical letters. They're not, Your Honor. The Donovan Letter squarely says, and this is on page 18 of the Joint Appendix, on February 6, 1995, the United Nations provided the U.S. mission with official notification of Mr. Muthana's termination from the Yemeni mission. It also notes the notification of when he had been terminated, September of 1994, and then it says that Mr. Muthana and his family enjoyed diplomatic immunity until February 6, 1995. So it addresses the different things. I still don't see why that's any different, why that's necessarily what it states is inconsistent with the Graham Letter. Your letter, the one you're relying on, the February letter, provides more information, but on the technical question of notification, they're inconsistent with each other. Your Honor, it's not that there's not an inconsistency here. It's that the Donovan Declaration is – there's not an inconsistency on any relevant question. The Donovan issue speaks more comprehensively to the breadth of issues presented to this court. The Graham Letter is clipped and addresses only part of the features regarding Mr. Muthana, his termination, the notification, and his status. The Donovan certification is across the board of this is when official notification happened, this is when he had diplomatic immunity, and this is when it ended. The Graham Letter doesn't purport to speak to those things. This is why there's not a dispute, Your Honor. I take Your Honor's point about what the Graham Letter says. I'm just looking at it right now. Because according to the information provided to us officially by the United Nations, our records indicate that the plaintiff was notified to the United States Commission as a diplomatic member from this period of time. It seems to me like the Geneva Convention, if you properly interpret it, requires. Now, yes, the later letter, the Donovan Letter, has more information, but on the technical question of notification, we have one that says he was notified for the period of time since December, and we have another letter that says he was notified for the period of time since December. Again, I think, Your Honor, it could look like a different case if one letter said, and I'm not suggesting that this would change under the law, but I'm saying what we don't have here. We don't have a Graham Letter that says Mr. Muthana and his family enjoyed diplomatic immunity until September 1, 1994, and no longer thereafter. Well, but that's very clearly. I mean, it says during this period of time he was recognized. That's not inconsistently saying he wasn't recognized. It's not inconsistent, Your Honor, but it also doesn't answer that question, and we do have a certification that does answer that question. And as I've tried to emphasize, Your Honor, I think under Baez, and these certifications have a special status here, and we have this Donovan certification that squarely speaks to that dispositive issue of what the status was after that September 1 date when Ms. Muthana was born, and later when Mr. Muthana was himself ceased to have possessive immunity. So I think the critical point is, Your Honor, is that there's no conflict between the documents. It's on the relevant question. The Donovan certification just speaks conclusively to an issue that the Graham Letter does not address. And I take your point, Your Honor. Oh, you're fine. Val, go ahead. Yes. Could I ask you a question about standing, about the next friend standing, which the government challenged below but did not raise again here on appeal, but obviously we have an independent duty to assess jurisdiction. If we were to determine that Mr. Muthana did not have next friend standing for his daughter because she's not clearly covered by Rule 17 and the factors in Whitmore, could we find that there was next friend standing for Mr. Muthana's grandson, John Doe? And would that allow us to reach the citizenship question of his mother? That's a good question, Your Honor. I'm trying to see as to whether we squarely address that. I think potentially the issue, Your Honor, there is that I can't recall. This case is preceded essentially with John Doe is somewhat of a derivative of status, derivative status of Ms. Muthana. And I'm trying to recall the allegations of standing and whether any have been made on behalf of John Doe. I think it's really focused on Ms. Muthana. So I don't have a – I may need to think about that a little bit more, Your Honor. I'm not certain of that. I do think that's an important question, whether the next friend standing question could be speculated as to Ms. Muthana and her son. Right, Your Honor. And my apologies for not recalling it. It's possible that that was addressed at some point, and I'm just not summoning it to mind. But I can look at it. If it would be useful to the Court, we could submit something on the point. Yeah, I would be interested to know the government's position on that question. Very good, Your Honor. And is it your position, though, that – I mean, do you still – I guess I'm interested why that argument was put aside. Right, Your Honor. I suppose that what I'll say is that we still think that we are right, that there is a lack – that the district court could have appropriately granted dismissal for lack of next friend standing for each of the reasons we set forth in the district court. As is often the case, we have not pressed that issue here. We could also address that, too. But I do think the reasons we gave – lack of adequate explanation, the fact that Ms. Muthana seems to have access to Western media, gives interviews, that kind of a thing doesn't suggest that she's truly inaccessible and unable to proceed in her own name. There's some question about harmony of interests. So those are questions. But we – I don't know that I can say much more on why we haven't pressed those in defense of the judgment below. Standing is now readily available for the grandson, given that he is a minor, and so would be within Rule 17, arguably. Got it, Your Honor. We can try to address that, Your Honor. Any further questions? No questions. Ms. Chuck, you used up all your time, but we'll give you two minutes. Thank you, Your Honor. I appreciate that. I would like to begin first by referring to the October 2004 letter. We do know the purpose of that because at this stage we take Ms. Muthana's allegations as true and his affidavit states that he requested that letter in response to the Department of State asking him about the status of his diplomatic community at the time of Ms. Muthana's birth because he had applied for a passport for her. So because this was a motion to dismiss which was then converted, at this stage we take his allegations as true on that fact. So we know exactly why this letter came to be. It was when he requested a letter specifically to address his diplomatic community or his diplomatic status as of the time of her birth. I would also say, as I didn't mention earlier, we do have the claim on behalf of Mr. Muthana directly where he has specifically said to the FBI that he wants to be able to provide food and clothing for his daughter and for his grandson, and he was specifically told by the FBI that if he does that, if he provides those specific items to these specific individuals in their current situation, that he will be committing, he'll be in violation of 2339B and he would be charged with material support of terrorism for doing that. So this is not an advisory or hypothetical opinion. Finally, as to Justice Rao's question regarding standing, again, not surprisingly we agree with the district court on its ruling on that issue, but I would say that we do assert in our complaint that standing exists as to the minor child as well, and that requires examining the citizenship of his mother since his citizenship would come from his mother's citizenship. If there is to be additional briefing on that, we don't believe it's necessary, but if there is to be any additional briefing on that subject, we would like the opportunity to do so as well. Any further questions for Judge Rao on that issue? No, I mean, it's your position that if we have standing over John Doe, we would be able to reach the citizenship question of Ms. McDonough, and it could have been shared with us on that. Yes, Your Honor, I did. No further questions. Okay. Ms. Johnson, thank you very much for the case. Thank you, Your Honor. Thank you, Your Honor. This honorable court is now adjourned until Tuesday, June 2nd at 930 a.m.
judges: Tatel, Rao, Sentelle